ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Molly Jessie Company ) ASBCA No. 62140
)
Under Contract No. W912WJ-19-P-0023 )

APPEARANCE FOR THE APPELLANT: Mr. Greg Ryan
Principal/Partner

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
Engineer Chief Trial Attorney
Jenna N. Gustafson, Esq.
Engineer Trial Attorney
U.S. Army Engineer District, New England
Concord, MA

OPINION BY ADMINISTRATIVE JUDGE SHACKLEFORD

This is an appeal from a termination for default of a purchase order contract. Appellant has elected Board Rule 12.3, Accelerated Procedure, and each party has decided to proceed under Board Rule 11, Record Submission. Each party filed an initial brief and a reply brief. In addition to the briefs, the record includes the government's Rule 4 file, as supplemented, tabs 1-45, appellant's supplement to that file, exs. A1-A4, which it filed as an attachment to its "Reply to Respondent's Answer" on September 16, 2019. Only the termination for default is at issue here.

FINDINGS OF FACT

1. On January 4, 2019, the U.S. Army Corps of Engineers, New England District (government or Corps) issued Request for Quotations (RFQ) No. W912WJ19Q0033 to perform the work set forth in an attached schedule. Item No. 0001 of that Schedule described the work as follows:

> NHL Replace Sanitary Sewer Pipe
> FFP
> Contractor shall furnish all labor, materials, equipment,
> and transportation to remove and replace approximately
> 320 feet of existing vitrified clay (VC) sanitary sewer
> piping from the Comfort Station to the existing distribution

box at North Hartland Lake, Hartland, VT in accordance
with the Statement of Work.

(R4, tab 2 at 1-2)

2. The Schedule further stated that "site visits are highly recommended prior to providing a quote." (*Id.* at 2) Paragraph 7 of the Quotation Instructions stated:

Contractors are not required to submit an Accident
Prevention Plan (APP) with their quote. The successful
offeror will be required to submit this document at the
direction of the Technical Point of Contact. The APP must
be accepted by the Government designated Authority prior
to the commencement of work.

(*Id.* at 3)

3. Also included with the RFQ was a Statement of Work (SOW), Section A of which gave a more detailed description of the work to be performed (R4, tab 2 at 4). Section D, paragraph 1, Accident Prevention Plan, of the SOW provided in part as follows:

The Contractor shall prepare an Accident Prevention Plan
(APP) specific to the activities being performed. It shall
include an Activity Hazard Analysis (AHA) as described
in Paragraph "2. AHA" below. All work shall be
conducted in accordance with the APP, the U.S. Army
Corps of Engineers Safety and Health requirements
Manual (EM 385-1-1, 2014 edition), and all applicable
Federal, State, and local safety and health requirements. A
copy of EM 385-1-1 can be accessed electronically using
the following link:

http://www.publications.usace.army.mil/Portals/76/Publica
tions/EngineerManuals/EM_385-1-1.pdf

The APP shall detail how safety and health will be
managed during the project. The APP shall address the
requirements of applicable Federal, State and local safety
and health laws, rules, and regulations. The Contractor
shall comply with Federal Acquisition Regulation Clause
No. 52.236-13 for Accident Prevention, which is added by
reference. Special attention shall focus on the

2

requirements of EM 385-1-1, specifically Section 01.A.11 through 01.A.18, Figure 1-2 AHA, and Appendix A (Minimum Basic Outline for Accident Prevention Plan). The APP shall be developed by a qualified person. The Contractor shall be responsible for documenting the qualified person's credentials. Work shall not proceed until the APP has been reviewed by the Government Designated Authority (GDA) and deemed acceptable for use on the project.

(R4, tab 2 at 12)

4. Section D, paragraph 4 of the SOW, Site Safety and Health Officer (SSHO) required the contractor to designate one person as SSHO, whose qualifications were to include:

A. A minimum of five years of experience in implementing safety and health programs at similar projects;
B. Documented experience in personal protective equipment;
C. Working knowledge of construction safety procedures as well as Federal and state occupational safety and health regulations.
D. Completion of the 30-hour OSHA Construction Safety class or as an equivalent, 30 hours of formal construction safety and health training covering the subjects of the 30-hour course.

(R4, tab 2 at 13)

5. Section E of the SOW, General and Administrative Submittals Required, called for the successful contractor to submit for approval an initial Project Schedule within five days after receipt of notice to proceed (NTP), the Accident Prevention Plan to include an AHA for each major phase of work, documentation of SSHO qualifications, and make several other submittals (R4, tab 2 at 13-14).

6. Performance of the contract was to be completed within 120 days after issuance of the NTP (R4, tab 2 at 35).

7. Molly Jessie Company (appellant or MJC) submitted a quotation on January 18, 2019, to perform the work set forth in the RFQ including the SOW. The amount of the quote was $34,000 firm-fixed price. (R4, tab 3 at 1-2) The government

(by Jennifer Samela) advised MJC that it was the apparent low bidder on January 22, 2019 and asked if it was going to perform the work itself or use a subcontractor (R4, tab 4 at 2). Mr. Ryan, MJC's facility Manager, responded that it would do the work itself. In reply, on January 24, 2019, Ms. Samela asked "[a]re you familiar with the US Army Corps of Engineers safety submittals?" Mr. Ryan replied on the same date:

> I will review the Safety related submittals in general to report back to you if I have concerns or not and any unfamiliarity that I may encounter after I breeze through the folder again for assurance/insurance purposes to respond back to your request.

(*Id.* at 1-2)

8. On January 28, 2019, Mr. Ryan further replied:

> I have reviewed our plans again, and you refer to the requirements of EM-385-1-1 in general on page 12 of section 1 accident prevention plan. This U.S. Army Corps of Engineers Safety and Health Manual is what we currently use and provide toe [sic] other agencies in the government contracting requirements and submissions currently and I see no deviation as referred to your statement of work body of language provided.

(*Id.* at 1)

9. On February 19, 2019, Ms. Samela transmitted the Purchase Order to Mr. Ryan, stating that if he agreed "to the terms and conditions, he should execute one copy." She further stated that since the "award is below the level for bonding, this e-mail shall serve as your Notice to Proceed." The terms and conditions included the same SOW as had accompanied the RFQ, including the sections discussed above (R4, tab 6 at 1-2). In addition the purchase order incorporated by reference FAR 52.249-10, DEFAULT (FIXED-PRICE CONSTRUCTION) APR 1984 (R4, tab 5 at 43). Mr. Ryan signed the order on February 26, 2019 (R4, tab 5 at 1). Ms. Samela confirmed to Mr. Ryan on February 27, 2019 that the "period of performance [was] until 19 June 2019" (R4, tab 8 at 1), which was 120 days after receipt of the NTP.

10. On May 2, 2019, the Contracting Officers Representative (COR), Mr. Wayne Chmielewski, sent a letter of concern to MJC regarding a lack of progress in submitting an acceptable site-specific Accident Prevention Plan (APP) and an Initial Project Schedule. Apparently an APP was submitted on March 4, 2019 but it did not include the qualifications of an SSHO who met contract requirements. Further, the

4

SSHO was required to have completed the 30-hour OSHA Construction Safety Class and no evidence of that was included. Appellant was also advised that certificates were required for two employees to be first-aid and CPR qualified in accordance with EM-385-1-1. (R4, tab 27)

11. In a lengthy response on May 3, 2019, Mr. Ryan did not dispute that the information sought in the COR's letter of concern was required by the contract nor did he dispute that it had not been provided. His concern was the time and cost of the paperwork required that he thought was excessive for a contract of that size as suggested by the final sentence in his response:

> At this time here I have asked the office to not put further cost and expense, effort or anything related to the project as you have exhausted the funding that was initially planned for the entire project and we haven't even started yet, due to your demands that go unsupported for this type of project and size.

(R4, tab 29 at 1-2)

12. On May 14, 2019, the contracting officer issued a cure notice advising appellant that its lack of response to the Corp's request for required submittals was endangering performance and that if it did not comply by curing the deficiencies within ten days of receipt of the cure notice, the contract might result in a termination for default pursuant to contract clause 52.249-10, Default (Fixed-Price Construction). (R4, tab 30 at 2)

13. MJC replied that same day suggesting that it met the requirements without providing the necessary paperwork to substantiate it. It also continued to question the motives of the Corps, stating:

> We do not comprehend all of the major requirements for documentation over and above other jobs of this magnitude. It appears to be discrimination and we certainly hope it isn't related to our ethnic background.

(R4, tab 31 at 3)

14. The Corps replied on May 29, 2019 disputing each point made by appellant and advising that unless the deficiencies were cured within five extended days, the contract might be terminated for default (R4, tab 32 at 1-2).

5

15. A show cause notice was issued by the Corps to appellant on June 11, 2019, stating that it was considering terminating the contract for default, but before doing so, it was giving MJC an opportunity to make a submission, in writing, with supporting documentation, detailing why the default was "due to causes beyond its control and without its fault or negligence, and which MJC believed excused its failure to perform the contract." (R4, tab 33 at 1-2)

16. Appellant replied, again not disputing the particulars of the missed proper submissions but offering the excuse that the paperwork requirements exceeded what should have been required for a contract of this size (R4, tab 34). The government found no merit in the arguments presented in MJC's response to the show cause notice and advised that it was proceeding to terminate the purchase order for default (R4, tab 35 at 1), which it did by contracting officer's final decision on June 25, 2019, stating that no work had been performed since award of the purchase order on February 19, 2019 and that appellant failed to cure the deficiencies outlined in the cure notice (R4, tab 39).

17. The final decision was timely appealed to the Armed Services Board of Contract Appeals and was docketed on July 26, 2019 as ASBCA No. 62140.

## DECISION

The legal standards for a default termination are well established. Under the default clause in this contract, FAR 52.249-10 DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984), the government may terminate the contract for default when the contractor, without excuse, fails to diligently prosecute the work or fails to complete the work within the time prescribed by the contract. The government bears the burden to prove that its termination was justified. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764-65 (Fed. Cir. 1987). If the government establishes a *prima facie* case justifying the termination, the burden shifts to the contractor to prove the default was excusable. *Truckla Services, Inc.*, ASBCA No. 57564, 17-1 BCA ¶ 36,638 at 178,445 (citing *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312).

The contracting officer terminated the contract for default on June 25, 2019, six days beyond the contract completion date and no onsite work had been accomplished and thus the government has carried its burden to establish a *prima facie* case (findings 10, 12, 14-15). The burden thus shifts to MJC to demonstrate that its default was excusable (findings 11, 13, 16). Appellant has failed to meet its burden. It continues to assert in its brief and in its reply that the requirements insisted upon by the government were requirements that should have applied to larger contracts, yet it offers no evidence of that. The requirements the government insisted upon were in the SOW issued with the Request for Quotations and were similarly in the SOW which

6

became part of this purchase order contract. It cannot now complain about their inclusion and seek to avoid the consequences of failing to follow them. The time to complain about the paperwork requirements was prior to submission of its bid, not now after the government has insisted upon strict compliance. Appellant has failed to demonstrate that its default was excusable. *ADT Constr. Grp.*, 13 BCA ¶ 35,307 at 173,312 (citing *Empire Energy Mgmt. Servs., Inc.*, ASBCA No. 46741, 03-1 BCA ¶ 32,079 at 158,553). Thus, the default termination was appropriate.

## CONCLUSION

The appeal is denied.

Dated: February 12, 2020

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62140, Appeal of Molly Jessie Company, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals
